UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

LINDA ALLEN,                                    )
                                                )
         Plaintiff,                             )
                                                )
v.                                              )    No. 3:23-cv-01148
                                                )
JOSHUA LO, REESE HARPER,                        )
JAMES HAMBRICK, and THE CITY                    )
OF MT. JULIET, TENNESSEE                         )
                                                )
         Defendants.                            )

## MEMORANDUM OPINION

This case arises from the tragic death of Eric J. Allen, who was shot and killed by Mt. Juliet City Police Sergeant Joshua Lo as he attempted to flee a traffic stop. Pursuant to 42 U.S.C. § 1983 and Tennessee law, Mr. Allen's mother, Plaintiff Linda Allen, seeks to hold several police officers and the City of Mt. Juliet, Tennessee, civilly liable for this incident. Before the Court are Defendant Sergeant Lo's Motion for Judgment on the Pleadings (Doc. No. 37), and Mt. Juliet City Police Officer Reese Harper's Motion for Summary Judgment and/or Motion to Dismiss (Doc. No. 30). These motions are fully briefed and ripe for review. (See Doc. Nos. 31, 32, 38, 43, 44, 47). For the following reasons, the Court will grant both motions in full.

## I.    BACKGROUND AND UNDISPUTED FACTS[1]

Sergeant Lo's and Officer Harper's body cameras and dash cameras recorded and captured the relevant events in this case.

---

[1] The Court must apply two different standards of review because Sergeant Lo has moved for judgment on the pleadings under Federal Rule of Civil Procedure 12(c), and Officer Harper has moved for summary judgment under Rule 56. To ensure proper application of these standards, the Court draws the facts in this section from the Complaint and the video exhibits described below, unless specifically noted otherwise.

## A.  <u>Initial Traffic Stop</u>

On November 2, 2022, at around 10:55 p.m., Sergeant Lo turned on his patrol vehicle's blue lights and stopped a car for, among other things, having a broken headlight.  (Doc. No. 1 ¶ 16; J. Lo Body Cam at 0:00:51).[2]  Indyja Mitchell was the driver, Mr. Allen was sitting in the front passenger seat, and their dog "Buttercup" was in the back seat.  (Doc. No. 1 ¶¶ 16, 20).  After initiating the traffic stop, Sergeant Lo approached the passenger side of the vehicle and knocked on the front window.  (J. Lo Body Cam at 0:01:58).  Mr. Allen rolled down the window, and Sergeant Lo stated:  "So, couple things going on here.  You know the speed limit through Providence is 35, right?  Yeah, you [are] going a little fast today, you got a headlight out, and your tags are all messed up."  (<u>Id.</u> at 0:02:10).  Sergeant Lo then asked for Mitchell's driver's license, car registration, and insurance information.  (<u>Id.</u> at 0:02:30).  Mitchell provided an identification card, but she told Sergeant Lo she did not have a valid driver's license, and she was unable to provide her car information.  (<u>Id.</u> at 0:03:30).  Mr. Allen likewise gave Sergeant Lo his identification card and stated he did not have a driver's license.  (<u>Id.</u> at 0:03:45).

After learning that neither Mitchell nor Mr. Allen had a valid driver's license, Sergeant Lo asked Mitchell if she could call someone she knew to come pick up the car.  (<u>Id.</u> at 0:04:40).  Mitchell said yes, and that it would not take long for someone to arrive.  (<u>Id.</u> at 0:04:47).  Sergeant Lo then returned to his patrol vehicle and apparently ran the identification cards he received from Mitchell and Mr. Allen.  (<u>Id.</u> at 0:04:55).  When Officer Harper arrived on the scene shortly thereafter, (<u>id.</u> at 0:07:50), Sergeant Lo informed him that he had observed a "dab pen" in plain view on the vehicle's center console, (<u>id.</u> at 0:08:48).

---

[2] Defendants manually filed with the Clerk's office a copy of Sergeant Lo's body cam, Officer Harper's body cam, Sergeant Lo's dash cam, and Officer Harper's dash cam.  (<u>See</u> Doc. Nos. 34, 40).  Citations to a particular video's timestamp reflect the approximate start time of an event.

## B.     Removal From Vehicle and Consent to Search

Sergeant Lo and Officer Harper returned to Mitchell's car together, with Sergeant Lo standing at the driver's side and Officer Harper at the passenger's side with Mr. Allen. (Id. at 0:09:15). After obtaining the car's "VIN" information, Sergeant Lo asked Mitchell to step out of the car, and to roll her window up so that Buttercup would not run into the street. (Id. at 0:10:45). Mitchell got out and followed Sergeant Lo to the back of her car, after which he explained she would be receiving a citation for driving without a license. (Id. at 0:11:00). Sergeant Lo then asked Mitchell if the dab pen in the center console contained THC (or marijuana), and Mitchell responded "probably" but it was not hers. (Id. at 0:11:30). Sergeant Lo stated he would not be citing her for the marijuana, but that he would need to search her car and confiscate the pen for destruction. (Id. at 0:11:59). Michell replied, "Yeah that's okay." (Id. at 0:13:15).

## C.     Use of Taser and Deadly Force

After receiving Mitchell's consent to search her car, Sergeant Lo returned to the passenger's side and gestured for Officer Harper to go back with Mitchell. (Id. at 0:13:22). Sergeant Lo then spoke to Mr. Allen through the open window and asked him to step out of the car. (Id. at 0:13:27). Mr. Allen responded by pulling his seatbelt over his head and reaching and moving towards the driver's side. (Id. at 0:13:40). Sergeant Lo again asked him to get out of the car and to "quit reaching" because "you're scaring the crap out of me doing that." (Id. at 0:13:43). Mr. Allen responded that he did not have anything. (Id. at 0:13:46).

Sergeant Lo again ordered Mr. Allen to get out of the car and reminded him to secure Buttercup when he did so. (Id. at 0:13:50). Mr. Allen rolled up the window just like Mitchell had done previously, but he remained in the vehicle with his hands up. (Id. at 0:14:00). At that point, Mr. Allen suddenly began climbing over the center console into the driver's seat. (Id. at 0:14:05). Sergeant Lo opened the passenger door and repeatedly asked Mr. Allen, "What are you doing?

3

What are you doing? Stop." (Id.). Buttercup jumped out of the car, and Officer Harper walked towards the car to stand behind Sergeant Lo. (Id. at 0:14:07).

Sergeant Lo ordered Mr. Allen to stop climbing into the driver's seat or else he would be tased. (Id. at 0:14:09). Mr. Allen did not comply. (Id.). Sergeant Lo deployed his taser and climbed into the car. (Id. at 0:14:11). After being tased, Mr. Allen shifted the car into drive and accelerated down the two-lane highway with Sergeant Lo in the passenger seat, causing the passenger side door to close. (Id. at 0:14:12). With other vehicles driving on the highway, Sergeant Lo yelled: "Don't you go nowhere! Don't you go nowhere! Son of a b----. Stop the car! Stop the car! I'm gonna shoot you! I'm gonna shoot you! I'm gonna shoot you if you don't stop!" (Id. at 0:14:15). Mr. Allen did not comply but held up his right hand and again said he did not have anything, as he continued to drive at a fast speed. (Id. at 0:14:20). That is when Sergeant Lo drew his gun and fired three shots at Mr. Allen's shoulder area in rapid succession. (Id. at 0:14:21). The car eventually came to a stop, and Sergeant Lo exited the vehicle. (Id. at 0:14:50). Officer Harper, who ran to his patrol vehicle when Mr. Allen started driving, caught up and helped Sergeant Lo administer first aid to Mr. Allen until EMS arrived. (Id.; see also R. Harper Body Cam at 0:07:05). Mr. Allen died from his injuries. (Doc. No. 1 ¶ 23).

### D. Procedural Background

Plaintiff, on behalf of her son Mr. Allen, filed the instant lawsuit against Defendants Sergeant Lo, Officer Harper, Chief of Police James Hambrick, and the City of Mt. Juliet, Tennessee. (Id. ¶¶ 5–10). The Complaint asserts fifteen separate causes of action under § 1983 and Tennessee law, and alleges, among other things, that Sergeant Lo and Officer Harper violated Mr. Allen's constitutional rights by unlawfully detaining him and using excessive force. Sergeant

Lo and Officer Harper, believing qualified immunity insulates them from this lawsuit, filed the instant motion for judgment on the pleadings and motion for summary judgment, respectively.[3]

## II.  SEARGEANT LO'S MOTION FOR JUDGMENT ON THE PLEADINGS

Sergeant Lo argues that the Court should grant his motion for judgment on the pleadings because none of his actions violated Mr. Allen's rights under federal or state law, and because he is entitled to qualified immunity.  (See Doc. No. 37 at 1).  The Court agrees.

### A.  Legal Standard for Judgment on the Pleadings

A motion for judgment on the pleadings is governed by Rule 12(c) and is analyzed the same as a motion to dismiss for failure to state a claim under Rule 12(b)(6).  Jackson v. Prof'l Radiology Inc., 864 F.3d 463, 466 (6th Cir. 2017).  In ruling on such motions, "a district court 'must construe the complaint in the light most favorable to the plaintiff, accept all of the complaint's factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of his claim that would entitle him to relief.'"  Engler v. Arnold, 862 F.3d 571, 574–75 (6th Cir. 2017) (quoting Kottmyer v. Maas, 436 F.3d 684, 689 (6th Cir. 2006)).  "To survive a Rule 12(c) motion, the complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  Id. at 575 (internal quotation marks omitted) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).  "Mere labels and conclusions are not enough; the allegations must contain 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  Id. (quoting Iqbal, 556 U.S. at 678).

---

[3] In Plaintiff's combined response to both motions, she agrees to withdraw all Eighth Amendment claims against all Defendants.  (Doc. No. 43 at 9).  As a result, the Court considers those claims dismissed and will not discuss them further.

"When reviewing a motion for judgment on the pleadings, [the Court] generally may only review the pleadings, any attachments to those pleadings, and documents that are referred to in the complaint and [are] central to the plaintiff's claim or are matters of public record." Saalim v. Walmart, Inc., 97 F.4th 995, 1002 (6th Cir. 2024) (citations and internal quotation marks omitted). The Sixth Circuit "acknowledged that where a complaint even 'implicitly relies on a video' it can make sense to consider it even at an early stage of litigation." Id. (internal alterations omitted) (quoting Bell v. Southfield, 37 F.4th 362, 364 (6th Cir. 2022)). However, "[i]f there is a factual dispute between the parties," the Court "can only rely on the videos over the complaint to the degree the videos are clear and 'blatantly contradict[]' or 'utterly discredit[]' the plaintiff's version of events." Bell, 37 F.4th at 364 (quoting Scott v. Harris, 550 U.S. 372, 380 (2007)).

Not only does the Complaint incorporate the officers' video exhibits by reference, it also explicitly mentions "Defendant Lo's bodycam video recording." (Doc. No. 1 ¶ 19). The videos are clear and central to Plaintiff's claims, and they capture the entire interaction between Sergeant Lo, Officer Harper, and Mr. Allen. See Bailey v. Ann Arbor, 860 F.3d 382, 386–87 (6th Cir. 2017). Plaintiff invites the Court to view the videos, (Doc. No. 43 at 6), and does not contest their authenticity. Therefore, the Court will consider the video exhibits without converting Sergeant Lo's motion into a motion for summary judgment. Of course, to the extent there is a factual dispute between the videos and the Complaint, the Court will only consider the videos if they blatantly contradict or utterly discredit Plaintiff's allegations. See Bell, 37 F.4th at 364.

## B.    Analysis of § 1983 Claims Against Sergeant Lo

The Complaint asserts several claims against Sergeant Lo under § 1983. Section 1983 provides that "an individual may bring a private cause of action against anyone who, acting under color of state law, deprives a person of rights, privileges, or immunities secured by the Constitution

6

or conferred by federal statute."[4] Wurzelbacher v. Jones-Kelley, 675 F.3d 580, 583 (6th Cir. 2012) (citations omitted). Sergeant Lo responded to these claims by raising the defense of qualified immunity, which is a judicially created doctrine that shields government officials "from liability for civil damages [under § 1983] insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Where, as here, a government official raises a qualified-immunity defense, "it is the plaintiff's burden to show that the [official is] not entitled to qualified immunity." Burgess v. Fischer, 735 F.3d 462, 472 (6th Cir. 2013) (citation omitted).

To overcome the presumption of qualified immunity at the pleadings stage, a plaintiff must plead facts showing that (1) the official violated a federal statutory or constitutional right, and (2) the unlawfulness of the official's conduct was "clearly established at the time," such that every reasonable person in the official's position would have known that what he is doing violates that right. See Reed v. Campbell Cnty., 80 F.4th 734, 742 (6th Cir. 2023) (citations omitted); Kennedy v. Cincinnati, 595 F.3d 327, 336 (6th Cir. 2010); Enoch v. Hogan, 728 F. App'x 448, 452–53 (6th Cir. 2018). The Court may consider these two prongs in any sequential order. See Kennedy, 595 F.3d at 336–37; Pearson, 555 U.S. at 236.

With these standards in mind, the Court will now address Plaintiff's § 1983 claims against Sergeant Lo and whether he is entitled to qualified immunity.

### 1. Unconstitutional Detention During Traffic Stop (Count VII)

Construed liberally, Count VII of the Complaint alleges that Sergeant Lo violated Mr. Allen's Fourth Amendment rights when he stopped Mitchell's vehicle and detained Mr. Allen.

---

[4] Neither Sergeant Lo nor Officer Harper dispute that they were acting "under color of state law" at the time of the relevant events.

(Doc. No. 1 ¶¶ 11, 81, 85; Doc. No. 43 at 2). "[W]hen law enforcement stops a vehicle, passengers in that vehicle are seized within the meaning of the Fourth Amendment and, thus, may challenge the constitutionality of the stop." Neal v. Melton, 453 F. App'x 572, 576 (6th Cir. 2011) (citing Brendlin v. California, 551 U.S. 249, 251 (2007)). A traffic stop does not violate an individual's Fourth Amendment right to be free from unreasonable searches and seizures if the stop is supported (1) by probable cause to believe a civil traffic violation occurred, or (2) by reasonable suspicion of ongoing criminal activity. United States v. Collazo, 818 F.3d 247, 253–54 (6th Cir. 2016) (citing United States v. Blair, 524 F.3d 740, 748 (6th Cir. 2008)).[5]

It is undisputed that, on the night of the incident, "Mitchell was driving a Honda Accord Coupe that had one headlight out." (Doc. No. 1 ¶ 16). Sergeant Lo can also be heard on the body cam video advising Mitchell and Mr. Allen that he stopped their vehicle for speeding and having a broken headlight. (J. Lo Body Cam at 0:02:10; see also Doc. No. 22 ¶ 17). Although Plaintiff characterizes Mitchell's broken headlight as a "pretext" for the stop, she does not challenge Sergeant Lo's factual observations. (See Doc. No. 43 at 2). Based on the Complaint's allegations, any reasonable jury would find that Sergeant Lo had probable cause to believe a traffic violation was occurring when Mitchell drove her vehicle in the dark without both headlights illuminated. See Tenn. Code Ann. § 55-9-406(a) (providing that "the headlights of every motor vehicle . . . shall be displayed during the period from one half (1/2) hour after sunset to one half (1/2) hour before sunrise"). "So long as an officer has probable cause to believe that a traffic violation occurred, the 'resultant stop is not unlawful and does not violate the Fourth Amendment.'" Neal, 453 F. App'x

---

[5] By citing criminal case law in this Memorandum Opinion, the Court follows "the common-sense presumption that the fourth amendment analysis employed in criminal cases is directly transplantable to section 1983 analysis." Simons v. Marin Cnty., 682 F. Supp. 1463, 1471 n.5 (N.D. Cal. 1987).

at 578 (quoting United States v. Davis, 430 F.3d 345, 352 (6th Cir. 2005)). The Court concludes that Sergeant Lo's initial stop of Mitchell's vehicle was lawful and did not violate Mr. Allen's constitutional rights.

Nor did Sergeant Lo violate Mr. Allen's right to be free from unreasonable searches and seizures when he asked him to get out of the car. "[P]olice officers may order drivers and passengers out of the automobile during the traffic stop without offending the Fourth Amendment." United States v. Noble, 762 F.3d 509, 521 (6th Cir. 2014) (citing Maryland v. Wilson, 519 U.S. 408, 414 (1997)). After conducting a lawful traffic stop, an officer may also detain an individual briefly "for investigative purposes if the officer has a reasonable suspicion . . . that criminal activity has occurred or is about to occur." Davis, 430 F.3d at 354. Here, Sergeant Lo observed what he believed was a "dab pen" in the center console of the vehicle. And when he questioned Mitchell about the pen, she admitted it "probably" contained THC, or marijuana, but that it did not belong to her. This admission gave Sergeant Lo evidence of a crime and at least reasonable suspicion to believe there was marijuana in the vehicle. See United States v. Lott, 954 F.3d 919, 923 (6th Cir. 2020) ("It is uncontested that Lott's admission to having marijuana in his car provided reasonable suspicion to the officers to prolong the stop."); see also United States v. Warren, 2015 WL 13745788, at *8 (W.D. Ky. Oct. 22, 2015) (collecting cases and holding that "[a] suspect's admission of the presence of contraband in a vehicle, standing alone, is enough to establish probable cause to search"). If that were not enough, Mitchell also consented to Sergeant Lo searching the vehicle. Thus, Sergeant Lo was justified in ordering Mr. Allen out of the vehicle so he could conduct his search.

For these reasons, no reasonable jury could find that Sergeant Lo unlawfully stopped or detained Mr. Allen in violation of his Fourth Amendment rights. Accordingly, the Court will grant

Sergeant Lo's motion for judgment on the pleadings and dismiss Count VII to the extent it alleges a claim based on an unconstitutional detention during the traffic stop.

### 2. Excessive Force (Counts II and VII)

Counts II and VII of the Complaint allege that Sergeant Lo violated Mr. Allen's rights under the Fourth and Fourteenth Amendments to be free from excessive force. (Doc. No. 1 ¶¶ 34, 39, 78–88). An excessive-force claim may arise under the Fourth, Eighth, or Fourteenth Amendments depending on "whether the plaintiff was a free citizen, convicted prisoner, or fit in some gray area in between the two." Burgess, 735 F.3d at 472 (citations omitted). Where, as here, the alleged victim is a free citizen, the excessive-force claim arises under the Fourth Amendment, not the Fourteenth. Id. (citing Graham v. Connor, 490 U.S. 386, 388 (1989)). As an initial matter, then, the Court must dismiss Plaintiff's excessive-force claim to the extent she alleges it arises under the Fourteenth Amendment.

Because Sergeant Lo claims he is entitled to qualified immunity, Plaintiff bears the burden of plausibly alleging facts from which a jury could find that Sergeant Lo used excessive force, and that Mr. Allen's rights were clearly established at the time. As to the excessive-force claim, "[t]he Fourth Amendment prohibits officers from using more force than is 'objectively reasonable' under the circumstances." Heeter v. Bowers, 99 F.4th 900, 912 (6th Cir. 2024) (citations omitted); see also Vanderhoef v. Dixon, 938 F.3d 271, 276 (6th Cir. 2019). Whether an officer's use of force rises to the level of excessive "depends on the facts and circumstances of each case viewed from the perspective of a reasonable officer on the scene and not with 20/20 hindsight." Vanderhoef, 938 F.3d at 276 (quoting Fox v. DeSoto, 489 F.3d 227, 236 (6th Cir. 2007)). In making this determination, the Court must balance "the nature and quality of the intrusion on [the plaintiff's] Fourth Amendment interests against the countervailing governmental interests at stake." Ciminillo v. Streicher, 434 F.3d 461, 466–67 (6th Cir. 2006) (citation omitted). The following three factors

help guide this balancing: (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight." Kostrzewa v. Troy, 247 F.3d 633, 639 (6th Cir. 2001) (quoting Graham, 490 U.S. at 396).

Plaintiff claims Sergeant Lo used unconstitutional excessive force when he used his taser, and when he used his gun. The Court will address these actions separately below.

a.    Use of Taser

As explained above, the Court reviews Sergeant Lo's use of his taser for "objective reasonableness" in light of the facts and circumstances he perceived at the scene. Graham, 490 U.S. at 396. The underlying suspected crime in this case—possession of marijuana—was not itself dangerous. However, the undisputed body camera video shows that Sergeant Lo asked Mr. Allen to step out of the car no fewer than four times, giving him more than ample opportunity to do so. Mr. Allen never complied. "A plaintiff's resistance to an officer's commands is relevant even if the officers were not attempting to arrest him." Kelly v. Sines, 647 F. App'x 572, 575 (6th Cir. 2016); see also Caie v. West Bloomfield Twp., 485 F. App'x 92, 96 (6th Cir. 2012).

In analyzing excessive-force claims, the Sixth Circuit pays "significant attention" to whether a person "poses an immediate threat to the safety of the officers or others," and acknowledges that this "risk can be magnified when the plaintiff engages in 'erratic' behavior, making it difficult for officers to predict what the [person] will do next." Kelly, 647 F. App'x at 575–76. Mr. Allen's actions in the body-cam video show that, not only did he refuse to step out of the car, but he also actively resisted Sergeant Lo's instructions. Mr. Allen then slid across the center console into the driver seat, shifted the car into drive, and proceeded at a high speed down the highway with other cars on the road. This erratic behavior placed Sergeant Lo in a threatening one-on-one situation with an unknown, noncompliant individual. In light of these "tense,

uncertain, and rapidly evolving" circumstances, see Graham, 490 U.S. at 396, Sergeant Lo's firing of his taser was not unreasonable. Also, at an absolute minimum, it was not clearly established that the Fourth Amendment prohibited Sergeant Lo from using a one-time taser shot under these circumstances, and Plaintiff does not offer any applicable law holding otherwise.

As such, Sergeant Lo's use of his taser did not violate Mr. Allen's constitutional rights, and he is entitled to qualified immunity for this conduct.

### b. Use of Deadly Force

The Court next considers whether Plaintiff met her burden to show that Sergeant Lo's use of deadly force violated Mr. Allen's constitutionally protected rights, and if so, whether the right was clearly established at the time Sergeant Lo fired his gun. See Pearson, 555 U.S. at 232.

### i. Constitutional Violation

"No doubt the use of deadly force by police officers is a serious matter and ought to be avoided—but not at all costs and not in all situations." Hocker v. Pikeville City Police Dep't., 738 F.3d 150, 154 (6th Cir. 2013). "The question is why and to what end the police deployed the force." Id. Deadly force does not constitute excessive force under the Fourth Amendment if the officer had "probable cause to believe" that the suspect "poses a threat of death or serious physical injury" to himself or others. Thomas v. Columbus, 854 F.3d 361, 365 (6th Cir. 2017) (quoting Tennessee v. Garner, 471 U.S. 1, 3 (1985)). The Court evaluates Sergeant Lo's actions from the perspective of a reasonable officer in his position, recognizing "that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation" without the benefit of hindsight. Vanderhoef, 938 F.3d at 276 (quoting Graham, 490 U.S. at 396–97); see also Thomas, 854 F.3d at 365.

Even drawing all reasonable inferences from the Complaint and video footage in Plaintiff's favor, the Court finds that Sergeant Lo's use of deadly force on Mr. Allen was objectively reasonable under the circumstances. The Complaint describes a scenario in which Mr. Allen did not flee from the traffic stop, but rather drove away "[i]n a panic" and did not present any danger to anyone. (Doc. No. 1 ¶¶ 21–23; see also Doc. No. 43 at 3, 6 (arguing that "Mr. Allen was compliant" and "was not fleeing")). The video exhibits utterly discredit Plaintiff's version of these events. See Bell, 37 F.4th at 365. The undisputed footage shows that Mr. Allen repeatedly refused to exit the car when Sergeant Lo commanded him to do so, crawled into the driver's seat without a license, fled the traffic stop on a busy highway while Sergeant Lo was in the passenger seat, and did not stop the car when Sergeant Lo warned him that he would be shot. The video also shows that Mr. Allen reached towards the driver's seat before fleeing and "scared the crap" out of Sergeant Lo before being tased. For these reasons, the Court finds it appropriate to assess Sergeant Lo's use of force in the "light depicted by the videotape." See Scott, 550 U.S. at 381.

The Court must also view the allegations and video footage with due deference to the quick decision Sergeant Lo had to make under the circumstances he perceived. Latits v. Phillips, 878 F.3d 541, 550 (6th Cir. 2017) (citing Graham, 490 U.S. at 396–97). This was not a situation where Mr. Allen "was merely trying to flee a traffic stop in a vehicle, which alone [would not be] sufficient to justify the use of deadly force." Lewis v. Charter Twp., 660 F. App'x 339, 343 (6th Cir. 2016) (citing Smith v. Cupp, 430 F.3d 766, 773 (6th Cir. 2005)). Rather, Mr. Allen fled a lawful stop *with an officer in his passenger seat* and with other vehicles in the area, all while refusing repeated warnings to stop the car under threat of being shot. What else was Sergeant Lo supposed to have done in this situation? Even if it turns out in hindsight that Mr. Allen's subjective intent was not to harm Sergeant Lo or others on the road, the Court must view his actions

"*objectively*, from the perspective of a reasonable officer at the scene." See Kelly, 647 F. App'x at 576 (citation omitted). The Court finds that a reasonable officer facing this "rapidly unfolding situation" would have had "probable cause to believe that [Mr. Allen] pose[d] a serious physical threat either to the police or members of the public." Williams v. Grosse Point Park, 496 F.3d 482, 487 (6th Cir. 2007) (citing Dudley v. Eden, 260 F.3d 722, 726–27 (6th Cir. 2001)). And any reasonable officer in Sergeant Lo's position would be justified in his use of deadly force. See, e.g., Godawa v. Byrd, 798 F.3d 457, 467 (6th Cir. 2015) ("[W]here a fleeing driver is imperiling the lives of officers or the public, it will generally be objectively reasonable for a police officer to employ deadly force to end the flight.").

The Court likens this case to Williams v. Grosse Pointe Park, in which the Sixth Circuit also found that an officer's use of force was objectively reasonable. 496 F.3d 482. There, the dash-cam video showed the suspect reverse his car and hit a police vehicle in an attempt to flee a traffic stop. Id. at 484. One of the officers at the scene stuck his gun through the driver's side window and pointed it at the suspect's head, after which the suspect accelerated and the officer "was knocked down" while holding onto the car. Id. Before the suspect could escape, however, a different officer shot several bullets into the car and rendered the suspect paralyzed. Id. The Sixth Circuit found that this use of force was not excessive, and affirmed the grant of summary judgment in favor of the shooting officer, because the suspect: "(1) was undeterred by having a weapon pointed at his head; (2) acted without regard for [the first officer's] safety; (3) was obviously intent on escape; and (4) was willing to risk the safety of officers, pedestrians, and other drivers in order to evade capture." Id. at 487. Here, like in Williams, it appears from the video footage that Mr. Allen was "undeterred by having a weapon pointed" at him—or that a reasonable officer in

Sergeant Lo's position would have perceived as much—because he continued to drive the car down the highway to escape.

Plaintiff's primary argument in support of her excessive-force claim is that Sergeant Lo "created the danger" that led to the shooting when he voluntarily climbed into the vehicle. (See Doc. No. 43 at 7 ("Sgt. Lo created the danger upon which he justified his unreasonable and unconstitutional conduct against Mr. Allen."). Maybe so, but Sergeant Lo's act of getting into the vehicle to prevent Mr. Allen's flight is not relevant to whether he used excessive force. The Sixth Circuit conclusively held in Stewart v. Euclid that an officer's "choice to enter the vehicle, and his choice not to exit the vehicle when it was stopped for ten to fifteen seconds, is irrelevant in assessing the reasonableness of his use of force." 970 F.3d 667, 673 (6th Cir. 2020); Thomas, 854 F.3d at 365 (citation and internal quotation marks omitted) ("We do not scrutinize whether it was reasonable for the officer to create the circumstances."); see also City & Cnty. of San Francisco v. Sheehan, 575 U.S. 600, 615 (2015) (holding that a Plaintiff "cannot establish a Fourth Amendment violation merely on tactics that result in a . . . confrontation that could have been avoided"). "Even if an officer approaches a scene recklessly, this will not necessarily render a later decision to protect himself unreasonable." Thomas, 854 F.3d at 365 (citation omitted). Sergeant Lo was legally entitled to enter the car even if his actions may have created an additional need for deadly force. See id.; Stewart, 970 F.3d at 673.

Plaintiff further argues that dismissal is improper at this stage because there are factual disputes about whether the shooting was objectively reasonable. (Doc. No. 43 at 9–12). Specifically, she argues that Mr. Allen was "physically unable to comply" with Sergeant Lo's command to stop the car because he was "incapacitated" from the taser shot. (Id. at 10). In making this argument, Plaintiff omits that Mr. Allen shifted the car into drive and began accelerating *after*

he was allegedly incapacitated. (See J. Lo Body Cam at 0:14:11). Moreover, even if Mr. Allen had a change of heart after being tased and wanted to stop the car, that does not change what Sergeant Lo reasonably perceived. An officer is entitled to qualified immunity even if a dangerous situation evolves into a safe one before the officer has a chance to realize the change. See Mullins v. Cyranek, 805 F.3d 760, 767 (6th Cir. 2015); Untalan v. Lorain, 430 F.3d 312, 315 (6th Cir. 2005).

In sum, Plaintiff has not shown that Sergeant Lo's use of deadly force against Mr. Allen was objectively unreasonable under the circumstances.

### ii.    Clearly Established

Even ignoring the above and assuming that Sergeant Lo's use of force was excessive under the Fourth Amendment, he is still entitled to qualified immunity unless he violated a clearly established right. A right is "clearly established" if "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987); see also Livermore ex rel Rohm v. Lubelan, 476 F.3d 397, 403–04 (6th Cir. 2007); Chappell v. Cleveland, 585 F.3d 901, 907 (6th Cir. 2009). "While a case need not be directly on point for a right to be clearly established at the time of the violation, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" King v. Rockford, 97 F.4th 379, 390 (6th Cir. 2024) (quoting Kisela v. Hughes, 584 U.S. 100, 138 (2018) (per curiam)). Courts should grant qualified immunity unless, "on an objective basis, it is obvious that no reasonably competent officer would have [acted in the same manner]; but if officers of reasonable competence could disagree on this issue, immunity should be recognized." Malley v. Briggs, 475 U.S. 335, 341 (1986); Ashcroft v. al-Kidd, 563 U.S. 731, 743 (2011) (citation omitted) ("When properly applied, [qualified immunity] protects 'all but the plainly incompetent or those who knowingly violate the law.'").

To rebut the presumption of qualified immunity, the plaintiff must define the clearly established right with precision and in a "particularized context," rather "than at a high level of generality or on the basis of a broad historical proposition." Baynes v. Cleland, 799 F.3d 600, 612–13 (6th Cir. 2015). Defining the clearly established right with specificity "is particularly important in excessive force cases." City of Escondido v. Emmons, 586 U.S. 38, 42 (2019) (per curiam). That is because "[u]se of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." Kisela, 584 U.S. at 104 (citation and internal quotation marks omitted). Unfortunately, "few cases have ever considered the danger faced by an officer inside a fleeing suspect's vehicle and at what point it justifies the use of deadly force." Stewart, 970 F.3d at 675.

Although Sergeant Lo was not obligated to do so, he identifies two Sixth Circuit cases involving a police officer's use of deadly force while being an unwitting passenger in a fleeing suspect's car. (Doc. No. 38 at 16–23). In Alexander v. Wayne, the Sixth Circuit held that an officer acted reasonably under the circumstances when he used deadly force against a suspect who "was dragging [the officer] backwards alongside his car onto a public road." 689 F. App'x 441, 442 (6th Cir. 2017). And in Stewart, the Sixth Circuit held that an officer was entitled to qualified immunity because it was not clearly established how much force an officer is allowed to use when he is inside a suspect's moving vehicle. 970 F.3d at 675. If anything, Stewart proves that the Sixth "[C]ircuit has not debated the types and level of threat faced by an officer inside a fleeing suspect's vehicle, much less placed it beyond debate." Id.

Plaintiff, on the other hand, is nearly silent on the "clearly established" prong of qualified immunity. Her opposition brief does not include even a single citation to *any* case law, let alone

clearly established law that would inform a reasonable officer in Sergeant Lo's position that deadly force in these factual circumstances constitutes excessive force. Instead, her sole argument on this issue is as follows:

> A person who has not been suspected of a crime, and is not committing a crime in the officer's presence cannot be viewed as not having a clearly established constitutional right not to be seized, battered, tased, and shot multiple times.

(Doc. No. 43 at 10). But those allegations do not accurately reflect what happened in this case. Mr. Allen *was* suspected of a crime (possessing marijuana), *did* commit a crime (fleeing the scene of a lawful traffic stop), and committed that crime in Sergeant Lo's presence. Mr. Allen also refused to comply with Sergeant Lo's repeated requests to step out of the vehicle. It is irrelevant whether an officer could use deadly force on a hypothetical citizen who did not act like Mr. Allen did here. See, e.g., Stewart, 970 F.3d at 675 (holding that unless the case is "obvious," a plaintiff cannot meet her burden on the clearly established prong merely by arguing that "it is unreasonable to seize a fleeing felon with deadly force when the suspect poses no immediate threat to officers or others").

At the very least, Plaintiff has failed to meet her burden to show that Sergeant Lo's use of deadly force violated a clearly established constitutional right. Sergeant Lo is therefore entitled to qualified immunity from Plaintiff's excessive-force claims, and the Court will dismiss Counts II and VII against him.

### 3. Gross Negligence (Count IX)

Curiously, Plaintiff continues to assert a standalone § 1983 claim against Sergeant Lo for "gross negligence."[6] (Doc. No. 1 ¶¶ 101–14). Recall that § "1983 is not itself a source of

---

[6] As Sergeant Lo flagged in his motion (Doc. No. 38 at 7 n.15), the Complaint asserts two identical claims that are both numbered "Count IX." (Doc. No. 1 ¶¶ 101–14). One is labeled "Survival Action – Gross Negligence" and the other is labeled "Wrongful Death – Gross Negligence."

substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." Albright v. Oliver, 510 U.S. 266, 271 (1994) (citation and internal quotation marks omitted). To state a claim under § 1983, a plaintiff must allege that a defendant acted under color of state law, and that the defendant's conduct deprived him of a constitutional right or right under federal law. Wurzelbacher, 675 F.3d at 583. Therefore, a state law tort claim such as gross negligence does not itself provide a *federal* right over which a plaintiff may sue under § 1983. See Lewellen v. Metro Govt., 34 F.3d 345, 351 (6th Cir. 1994) (noting that "[g]ross negligence is not actionable under § 1983").

Plaintiff relies heavily on Jones v. Sherrill, 827 F.2d 1102 (6th Cir. 1987) to argue that she can proceed with her gross negligence claim under § 1983. (See Doc. No. 43 at 8). The Court finds, however, that her reliance on this decades-old case is misplaced for multiple reasons. First, Jones merely held that an officer's gross negligence during a police pursuit may be sufficient to support a substantive due process violation, not that a plaintiff could bring a standalone claim under § 1983 for gross negligence. See Jones, 827 F.2d at 1106. Second, Jones has since been abrogated, and the Sixth Circuit no longer follows the notion that "gross negligence is sufficient to support a substantive due process claim." County of Sacramento v. Lewis, 523 U.S. 833, 841 n.3 (1998) (citing Foy v. Berea, 58 F.3d 227, 230 (1995)). Thus, Jones does not stand for the proposition that plaintiffs can sue police officers for gross negligence under § 1983. Accordingly, the Court will dismiss Count IX as a matter of law.

Because these claims contain identical allegations, the Court will group them and refer to them collectively as Count IX.

### 4. Violation of Plaintiff's Own Substantive Due Process Rights (Count XII)

In Count XII, Plaintiff alleges that Sergeant Lo is liable under § 1983 for violating *her* Fourteenth Amendment substantive due process right to have a familial relationship with Mr. Allen. (Doc. No. 1 ¶ 137–45). Plaintiff's sole argument in support of this claim is that she "is a proper party as she incurred expenses for the funeral of [Mr.] Allen's wrongful death, and is the representative of [his] estate." (Doc. No. 43 at 12).

This claim also fails as a matter of law because "a section 1983 cause of action is entirely personal to the direct victim of the alleged constitutional tort." Claybrook v. Birchwell, 199 F.3d 350, 357 (6th Cir. 2000) (collecting cases). Consequently, "no cause of action may lie *under section 1983* for emotional distress, loss of a loved one, or any other consequent collateral injuries suffered personally by the victim's family members." Id. (emphases added). Because binding Sixth Circuit precedent bars Plaintiff from bringing a *federal* claim for deprivation of "her right to a familial relationship" under § 1983, the Court will dismiss Count XII in its entirety.

### 5. Violation of Policies and Procedures (Count III)

Last, in Count III, Plaintiff brings a separate cause of action against all Defendants, including Sergeant Lo, for violating the City of Mt. Juliet police department's policies and procedures in myriad ways. (Doc. No. 1 ¶¶ 40–53). This claim is improper. As the Sixth Circuit held in Smith v. Freland:

> Under § 1983, the issue is whether [the defendant officer] violated the Constitution, not whether he should be disciplined by the local police force. A city can certainly choose to hold its officers to a higher standard than that required by the Constitution without being subjected to increased liability under § 1983. To hold that cities with strict policies commit more constitutional violations than those with lax policies would be an unwarranted extension of the law, as well as a violation of common sense. [Plaintiff's] position, if adopted, would encourage all governments to adopt the least restrictive policies possible.

954 F.2d 343, 347–48 (6th Cir. 1992) (adopting rule that "city policies do not determine constitutional violations"). Because Plaintiff cannot bring a standalone § 1983 claim for a violation of departmental policies, the Court will dismiss Count III in its entirety.

### C. Analysis of State Law Claims Against Sergeant Lo (Counts I, X, and XI)

In Counts I, X, and XI, the Complaint asserts claims against Sergeant Lo for battery and intentional infliction of emotional distress ("IIED") under Tennessee law. Specifically, Count I alleges that Sergeant "Lo committed battery upon [Mr.] Allen which caused him to suffer death, thereby entitling Plaintiff to damages" under Tenn. Code Ann. §§ 39-13-101 and 20-5-101.[7] (Doc. No. 1 ¶¶ 29–32). Counts X and XI, which are identical, allege that Sergeant "Lo's use of lethal force" caused Mr. Allen to suffer "extreme emotional distress prior to succumbing to his injuries."[8] (Id. ¶¶ 115–136). In essence, Plaintiff's state law claims are based on the same underlying events as her § 1983 excessive-force claim.

"Where a plaintiff asserts a battery claim under Tennessee law that arises out of the same use of force as her § 1983 excessive-force claim, the analysis is the same for both causes of action." Griffin v. Hardrick, 604 F.3d 949, 956 (6th Cir. 2010). That is, the same principles apply for "whether an officer violated a plaintiff's constitutional rights by using excessive force" as they do for "whether an officer committed state-law battery by using force that was 'clearly excessive.'" Id. (quoting Lee v. Metro Gov't, 596 F. Supp. 2d 1101, 1118 (M.D. Tenn. 2009)). The same is true for IIED claims premised on a use of excessive force. See Hodge v. Blount Cnty., 2018 WL

---

[7] In Tennessee, a "battery is any unlawful beating, or other wrongful physical violence or constraint, inflicted on a human being without his consent." Alexander v. Beale Street Blues Co., Inc., 108 F. Supp. 2d 934, 946 (W.D. Tenn. Mar. 19, 1999) (quoting Rushing v. State, 268 S.W.2d 563, 567 (Tenn. 1954)).

[8] The elements of an IIED claim in Tennessee "are that the defendant's conduct was (1) intentional or reckless, (2) so outrageous that it is not tolerated by civilized society, and (3) resulted in serious mental injury to the plaintiff." Rogers v. Louisville Land Co., 367 S.W.3d 196, 205 (Tenn. 2012).

1463390, at *6 (E.D. Tenn. Mar. 23, 2018) (collecting cases and noting that "a serious case of excessive force can constitute outrageous behavior such that it satisfies a claim of intentional infliction of emotional distress" under Tennessee law).

Moreover, "Tennessee recognizes a state-law qualified-immunity defense to state tort actions against government officers for their discretionary functions." Hammond-Beville v. Landis, 2022 WL 910569, at *5 (6th Cir. Mar. 29, 2022) (citing Youngblood v. Clepper, 856 S.W.2d 405, 405 (Tenn. Ct. App. 1993)). The "relevant question in a § 1983 suit is whether the defendant violated clearly established *federal* law," whereas the relevant question for Tennessee qualified immunity is "whether defendants committed a clearly established state tort violation." Id. "Otherwise, the federal and state qualified-immunity analyses are the same." Id. (citations and internal quotation marks omitted).

For the same reasons that Sergeant Lo acted reasonably in response to an uncertain and dangerous situation, the Court finds that Sergeant Lo's use of force does not support a claim for battery or IIED under Tennessee law. And even if reasonable minds could differ on whether his use of force was objectively reasonable, Plaintiff has not come forward with any authority showing that Mr. Allen's right to be free from *that* level of force was clearly established. Sergeant Lo is therefore entitled to qualified immunity from Plaintiff's Tennessee claims for battery and IIED, and the Court will dismiss Counts I, X, and XI against him.

## III. OFFICER HARPER'S MOTION FOR SUMMARY JUDGMENT AND/OR TO DISMISS

Officer Harper separately moves for summary judgment on all of Plaintiff's claims against him, arguing that there are no genuine disputes of material fact, and the Complaint does not articulate any legal theory that states a cause of action against him. (Doc. No. 31 at 22). Like Sergeant Lo, he also raises the defense of qualified immunity.

### A.    <u>Legal Standard for Summary Judgment</u>

Summary judgment is appropriate only where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." <u>Rodgers v. Banks</u>, 344 F.3d 587, 595 (6th Cir. 2003). The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient to survive summary judgment; rather, there must be evidence on which a trier of fact could reasonably find for the non-moving party. <u>Id.</u> In deciding a motion for summary judgment, the Court generally reviews all the evidence, facts, and inferences in the light most favorable to the party opposing the motion. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (citation omitted). "But where, as here, there is 'a videotape capturing the events in question,' the court must 'view[] the facts in the light depicted by the videotape.'" <u>Green v. Throckmorton</u>, 681 F.3d 853, 859–60 (6th Cir. 2012) (quoting <u>Scott</u>, 550 U.S. at 378–81).

### B.    <u>Analysis of § 1983 Claims Against Officer Harper</u>

#### 1.    **Unconstitutional Detention During Traffic Stop (Count VII)**

In Count VII, the Complaint alleges that Officer "Harper unlawfully detained and or seized" Mr. Allen, ostensibly in violation of his Fourth Amendment rights. (Doc. No. 1 ¶ 81). The undisputed video footage does not support this claim. By the time Officer Harper arrived at the scene, Sergeant Lo had already stopped Mitchell's vehicle for having a broken headlight, among other things. An "officer's reasonable suspicion [for a seizure] need not arise exclusively from his own direct observations." <u>Dorsey v. Barber</u>, 517 F.3d 389, 395 (6th Cir. 2008). "Rather, it can be derived from . . . directions from other officers." <u>Id.</u> (citing <u>Smoak v. Hall</u>, 460 F.3d 768, 779 (6th Cir. 2006)). "A seizure conducted in reliance on" directions from other officers "does not violate

the Fourth Amendment if the law enforcement officer who issued the information possessed the necessary reasonable suspicion." Smoak, 460 F.3d at 779 (citation omitted).

As the Court explained above, Sergeant Lo had both probable cause to believe a civil traffic violation occurred (broken headlight) and reasonable suspicion of ongoing criminal activity (possession of marijuana). Thus, Officer Harper did not violate Mr. Allen's constitutional rights when he briefly stood by Mr. Allen's door during the lawful traffic stop. See Davis, 430 F.3d at 354. Office Harper is entitled to summary judgment on Count VII.

### 2. Failure to Intervene (Count II)

The Complaint further alleges that Officer Harper violated Mr. Allen's constitutional right to be free from excessive force, which the Court interprets as a claim against Officer Harper for a failure to intervene. (See Doc. No. 1 ¶¶ 8, 37). "Section 1983 generally prohibits a plaintiff from holding one officer liable for another's actions," and, as a general matter, "an officer's 'mere presence' at the scene of excessive force generally does not suffice to hold the officer liable for the force." Chaney-Snell v. Young, 98 F.4th 699, 721 (6th Cir. 2024) (citations omitted). Instead, to establish a claim for "failure to intervene" against excessive force, a plaintiff must show that the officer: (1) "observed or had reason to know that excessive force would be or was being used," and (2) "had both the opportunity and the means to prevent the harm from occurring." Goodwin v. Painesville, 781 F.3d 314, 328 (6th Cir. 2015) (quoting Turner v. Scott, 119 F.3d 425, 429 (6th Cir. 1997)); see also Chaney-Snell, 98 F.4th at 722. Based on a careful review of the video exhibits, the Court finds that no reasonable juror could find for Plaintiff on either prong of this two-part test.

The Court notes at the outset that "an excessive use of force is a prerequisite to liability for a failure to intervene." Hamilton v. Franklin, Tenn., 608 F. Supp. 3d 599, 616 (M.D. Tenn. 2022) (citing Fazica v. Joran, 926 F.3d 283, 290 (6th Cir. 2019)); Ondo v. Cleveland, 795 F.3d 597, 611 (6th Cir. 2015). That is, if a plaintiff "present[s] no viable claim of excessive force," she "can

show no harm that other officers could have intervened to prevent." Ondo, 795 F.3d at 611. Because Plaintiff's excessive-force claim against Sergeant Lo fails for the reasons mentioned above (see supra Section II.B.2), her dependent failure-to-intervene claim against Officer Harper also fails.

But even assuming *arguendo* that Sergeant Lo used excessive force, Plaintiff offers no evidence to show that Officer Harper observed Sergeant Lo draw his gun or shoot Mr. Allen. Instead, the bodycam footage clearly and unmistakably shows that Officer Harper was not in the vehicle when Mr. Allen drove away with Sergeant Lo. (R. Harper Body Camera at 0:07:05). The video also shows that Officer Harper immediately turned his back to the moving vehicle and began running towards his own patrol vehicle to assist. (Id.). And there is nothing in the record that suggests Sergeant Lo otherwise indicated to Officer Harper that he was about to use deadly force against Mr. Allen. See Chaney-Snell, 98 F.4th at 722 ("Plaintiffs will have an easier time holding officers liable for a short use of force if the officer who engaged in it signaled an intent to do so ahead of time."). By the time Officer Harper caught up with the moving vehicle down the road approximately 35 seconds later, Mr. Allen had already been shot three times. No reasonable jury viewing the video footage could conclude that Officer Harper "observed or had reason to know" that Sergeant Lo was engaged in the use of excessive force. See Goodwin, 781 F.3d at 328.

Plaintiff separately fails to meet her burden on the second prong because she does not offer any evidence, allegations, or argument that Officer Harper had sufficient time to intervene in the shooting; that he was close enough to intervene; or that intervention was even possible. An officer cannot be held liable for failing to intervene if he does not have "a realistic opportunity to intervene and prevent harm." Wells v. Dearborn Heights, 2013 WL 4504759, at *6 (6th Cir. Aug. 26, 2013) (quoting Ontha v. Rutherford Cnty., 222 F. App'x 498, 507 (6th Cir. 2007)). The body camera

footage confirms that Officer Harper lacked a realistic opportunity to intervene and prevent Sergeant Lo from shooting Mr. Allen. Although the tasing may have occurred in Officer Harper's presence, the shooting clearly occurred inside the vehicle *after* Mr. Allen began driving away. (R. Harper Body Cam at 0:07:07). It took less than three seconds for Sergeant Lo to fire all three shots. (J. Lo Body Cam at 0:14:24). Even if Officer Harper could have observed the shooting, it would have been impossible for him to (1) catch up to the vehicle, (2) independently assess the situation, (3) determine that Mr. Allen was not posing a danger to other officers of the community, (4) perceive a substantial risk that Sergeant Lo was about to use unauthorized deadly force, and (5) somehow intercede and stop Sergeant Lo from suddenly shooting his gun, all within a matter of mere seconds. Plaintiff does not argue otherwise.

To avoid the timing and opportunity requirements for her failure-to-intervene claim, Plaintiff instead contends that "Officer Harper had a duty to intervene" because an objectively reasonable officer in his situation should have known there was no legal basis to detain Mr. Allen or search the vehicle in the first place. (See Doc. No. 43 at 11–12). Even if the initial stop and subsequent search were unlawful, however, that does not change the undisputed fact that Officer Harper had no time to both "perceive the incident" and have an opportunity to "intervene to assist" Mr. Allen. See Burgess, 735 F.3d at 476. The Court must also conclude that at no point did Officer Harper's alleged failure to intervene violate clearly established law, as Plaintiff cites no authority (and the Court is not aware of any) imposing on an officer a duty to intervene to prevent a shooting under analogous circumstances. On these facts, and considering the undisputed body camera footage, the Court finds that Officer Harper is entitled to qualified immunity. Accordingly, the Court will grant his motion for summary judgment and dismiss Plaintiff's failure-to-intervene claim under § 1983.

### 3. Violation of Policies and Procedures (Count III) and Violation of Plaintiff's Own Substantive Due Process Rights (Count XII)

For the same reasons discussed <u>supra</u> in Sections II.B.4 and II.B.5, Counts III and XII are legally improper and will be dismissed against Officer Harper.

### C. <u>Analysis of State-Law Battery Claim Against Officer Harper (Count I)</u>

Plaintiff's only state claim against Officer Harper is a "battery/ wrongful death" claim under Tennessee law. (Doc. No. 1 ¶¶ 29–32). Clearly, Officer Harper did not commit the alleged "battery upon [Mr.] Allen which caused him to suffer death." (<u>Id.</u> ¶ 30). Yet Plaintiff seeks to hold Officer Harper liable under the theory that he (1) "acted maliciously and/or" with "a wanton and reckless disregard for the rights" of Mr. Allen, and (2) "caused [Mr. Allen] to suffer injuries and wrongful death." (<u>Id.</u> ¶¶ 31–32). In other words, Plaintiff appears to argue that Officer Harper indirectly committed a battery under Tennessee Law because he failed to intervene and prevent Sergeant Lo's use of force.

Although Plaintiff presents no argument or legal authority demonstrating that Tennessee recognizes a tort claim for failing to intervene to prevent a battery, the Court will nevertheless assume this claim is appropriate. In analyzing this claim, the Court applies the same "failure-to-intervene" principles that it did for Plaintiff's § 1983 claim against Officer Harper. <u>See</u> <u>Griffin</u>, 604 F.3d at 956–57. Because Officer Harper is entitled to summary judgment on Plaintiff's § 1983 claim, he is also entitled to summary judgment on her Tennessee battery claim, and the Court will dismiss Count I against him.

## IV. CONCLUSION

For the foregoing reasons, the Court finds that Mr. Allen's death, while tragic and truly terrible, was not the result of constitutional violations or state-law torts for which Sergeant Lo or Officer Harper may be held liable. As a result, the Court will grant Sergeant Lo's motion for

judgment on the pleadings (Doc. No. 37) and Officer Harper's motion for summary judgment (Doc. No. 30), and will dismiss all of Plaintiff's claims against them.

An appropriate Order will enter.

_____
WAVERLY D. CRENSHAW, JR.
UNITED STATES DISTRICT JUDGE